## AFFIDAVIT OF SPECIAL AGENT MICHAEL J. RILEY

I, Michael J. Riley, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with Homeland Security Investigations ("HSI"), and have been so employed for over nine years.  My responsibilities include the investigation of federal offenses including, but not limited to, violations involving narcotics, money laundering, smuggling, and other federal offenses.  During my employment with HSI, I have been involved in numerous narcotics investigations and prosecutions, as well as other types of investigations.  I have, among other things, conducted surveillance, made arrests, monitored court-authorized wire taps and secured relevant information using various investigative techniques.  I have acted as the "case" or lead agent in approximately forty criminal investigations.

2.     I submit this affidavit in support of an application for a criminal complaint against Nestor PAYANO and Edwin LNU, a/k/a Edwin Erickson, for conspiracy to possess with intent to distribute cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and conspiracy to import or attempt to import cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 963 and 952(a).

3.     The facts described in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended for the limited purpose of setting forth probable cause for the requested complaint and does not set forth all of my knowledge about this matter.

### PROBABLE CAUSE

4.     From in or about August 2012, an HSI Confidential Informant ("CI") and a

Massachusetts State Police Officer acting under cover (the "UC") have been in contact with three members of a drug trafficking organization ("DTO") operating in the United States, Puerto Rico and in the Dominican Republic to discuss the smuggling of multiple kilograms of cocaine from the Dominican Republic to the United States via commercial aircraft. The CI is cooperating with HSI in return for Immigration benefits and/or consideration. I have worked with the CI on this and other investigations. The CI has provided information in the past in connection with drug investigations that has proven reliable. The CI has one prior felony conviction in 2002 in United States District Court in the District of Puerto Rico for possession with intent to distribute cocaine.

5.     During the investigation, the CI informed your affiant that he knows a Dominican male who goes by by the nickname "TIO" who wanted to organize a shipment of cocaine to be smuggled into the United States. TIO put the CI in contact with a New York-based DTO member who used the nickname "Cantaca." Cantaca was later identified as Nestor Payano ("PAYANO"). The CI told PAYANO that he had contacts at the Airport in Santo Domingo, Dominican Republic and at Logan International Airport in Boston, MA who could facilitate the movement of drugs from the Dominican Republic into the United States. The CI and PAYANO made arrangements for PAYANO to meet one of the CI's "contacts", who, in reality, was the UC.

6.     On October 4, 2012, PAYANO and another Hispanic Male, who was identified by PAYANO as "Edwin" (hereinafter "Edwin LNU"), met with the CI's contact, who, in reality, was the UC, in Foxboro, Massachusetts. PAYANO and Edwin LNU arrived in a 2005 Silver Honda Odyssey automobile bearing New York registration DDJ 1397, and registered to Maneryn PAYANO. The meeting was audio and video recorded, as well as physically surveilled by agents. During the meeting, PAYANO indicated that he was interested in shipping thirty to thirty-five

kilograms of cocaine into the United States. The UC told PAYANO that he (PAYANO) would have to pay $5,000 per kilogram shipped into the United States. The UC also told PAYANO that he would have to pay $1,000 per kilogram transported in advance and that the balance would be due on delivery of the cocaine. PAYANO told the UC that Edwin LNU would pick up the cocaine when it arrived in the United States.

      7.     On October 8, 2012, PAYANO and Edwin LNU met with the UC in South Attleboro, Massachusetts. PAYANO and Edwin LNU arrived at the meeting in the same 2005 Honda Odyssey automobile. The meeting was audio and video recorded, as well as physically surveilled by agents. During the meeting, PAYANO retrieved a black plastic bag from the back seat of his car and handed it to the UC. The bag contained approximately $22,500 in United States currency. Also during the meeting, PAYANO and the UC discussed meeting again later in the week so PAYANO could deliver the remaining $7,500 to cover the $30,000 advance payment for the transport of thirty kilograms of cocaine from the Dominican Republic into the United States.

      8.     On October 10, 2012, PAYANO again met with the UC in South Attleboro, Massachusetts. The meeting was audio and video recorded, as well as physically surveilled by agents. During the meeting, PAYANO handed the UC a black plastic bag which contained approximately $7,300 in United States currency. Also during the meeting, PAYANO indicated to the UC that he had a car with a hidden compartment that he would use to transport the cocaine after it was received from the UC in the United States.

      9.     On October 15, 2012, the CI met with unidentified Dominican members of the DTO in Boca Chica in the Dominican Republic. The meeting was audio recorded. The purpose of the meeting was for the CI to pick up the approximately thirty kilograms of cocaine to be transported

3

to the United States. During the meeting, the CI learned that the DTO was not ready to deliver the cocaine to the CI.

10.    On October 16, the CI conducted two recorded phone calls with PAYANO to further discuss the narcotics transaction. Later on October 16, 2012, the CI received a phone call from TIO, who provided the CI with the phone number of the person who, according to TIO, was in charge of supplying the cocaine to the CI. The person was referred to by TIO as "MAESTRO."

11.    Also on October 16, 2012, the CI conducted three recorded phone calls to MAESTRO in the Dominican Republic. During the conversations, MAESTRO indicated that he would pay an additional $5,000 for transportation to ensure that the narcotics transaction would still take place.

12.    On October 17, 2012, PAYANO met with the UC in South Attleboro, Massachusetts. PAYANO arrived at the meeting in the same 2005 Honda Odyssey automobile. The meeting was audio and video recorded, as well as physically surveilled by agents. During the meeting, PAYANO handed the UC a package that contained approximately $4,900 in United States currency. Also during the meeting, PAYANO again indicated that Edwin LNU would pick up the cocaine in the United States. PAYANO also indicated that his brother, (believed to be MAESTRO), was handling the transaction in the Dominican Republic.

13.    Between October 17 and November 20, 2012, the UC and PAYANO communicated by cellular telephone and text messaging. The UC recorded most of the calls and preserved the text messages. Also during that time, the CI was in communication with MAESTRO in the Dominican Republic. The CI kept a log of the calls to and from MAESTRO, indicating the time and the date of each call. During a phone call between MAESTRO and the CI during this time period, MAESTRO told the CI that a total of twenty kilograms of cocaine would be delivered to the CI to

4

be transported to the United States.

14.     During a conversation on November 16, 2012, MAESTRO told the CI that the cocaine was ready to be delivered to him (the CI) in the Dominican Republic. Also on November 16, 2012, the CI informed MAESTRO and the UC informed PAYANO that they would be ready to pick up the drugs in the Dominican Republic on Tuesday, November 20, 2012.

15.     On November 20, 2012, the CI and MAESTRO met in Santo Domingo in the Dominican Republic. HSI Special Agents and members of the Dominican Transnational Criminal Investigative Unit ("TCIU") conducted surveillance of the meeting. The meeting was also audio recorded and photographed. During the meeting, MAESTRO gave the CI a black suitcase which contained approximately thirteen kilograms of suspected cocaine. Shortly after the meeting, the cocaine was field-tested. The field test indicated a positive result for the presence of cocaine.

16.     From on or about November 23, 2012 through November 25, 2012, the UC conducted several separate and recorded telephone calls with both PAYANO and MAESTRO. During the phone calls with the UC, PAYANO and MAESTRO discussed the delivery of the thirteen kilograms of cocaine. PAYANO and MAESTRO agreed to pay the UC an additional $25,000 for the delivery of the thirteen kilograms of cocaine in the United States. PAYANO told the UC that he would send Edwin LNU to pick up the cocaine and pay the additional $25,000. The UC, PAYANO, and MAESTRO agreed that the delivery of the cocaine would occur on Tuesday, November 27, 2012 at approximately 4:00pm.

17.     During several telephone calls between the UC and PAYANO on November 27, 2012, they agreed that Edwin LNU would meet the UC at 4:00pm that day at the CBS Scene Sports Bar in Foxboro, Massachusetts to receive the thirteen kilograms of cocaine from the UC and to pay

5

the UC the additional $25,000. At approximately 4:21pm that day, Edwin LNU arrived at the CBS Scene Sports Bar and met the UC. After meeting, Edwin LNU and the UC left the bar and walked together to Edwin LNU's automobile. There, Edwin LNU retrieved approximately $25,000 in United States currency from his automobile and handed it to the UC. The UC then phoned another undercover officer ("UC2") (who was posing as UC1's associate) and told him to bring the drugs. Immediately thereafter, UC2 drove up in an undercover automobile (the "UC car"). UC2 got out of the driver's seat of the UC car and got into the backseat. UC1 got into the driver's seat and Edwin LNU got into the front passenger seat. Inside the UC car, UC2 unzipped a suitcase located on the backseat that contained thirteen bricks (approximately thirteen kilograms) of cocaine and showed the cocaine to Edwin LNU. Shortly thereafter, Edwin LNU got out of the UC car, opened the passenger-side backdoor of the UC car, and took the suitcase containing the cocaine. Edwin LNU then carried the suitcase containing the cocaine to his automobile and put it in his automobile. Immediately thereafter, law enforcement agents approached and arrested Edwin LNU.

18.     Shortly after his arrest, Edwin LNU was identified as Edwin Erickson.

19.     Based on the foregoing, I submit there is probable cause to believe that during in or about August, 2012 through on or about November 27, 2012, Nestor PAYANO and Edwin LNU, a/k/a Edwin Erickson, conspired to possess with intent to distribute cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and conspired to import and attempt to import cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 963 and 952(a).

6

Michael J. Riley
Special Agent
Homeland Security Investigations

Sworn to and subscribed before me this 28 day of November, 2012.

JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

7